**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| Sandra Harris, | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:21-cv-00417 |
| | ) |
| vs. | ) Judge Michael R. Barrett |
| | ) |
| The Children's Home of Cincinnati,[1] | ) |
| | ) |
| Defendant. | ) |

## OPINION & ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 19).  Plaintiff has filed a memorandum in opposition (Doc. 28), to which Defendant has replied (Doc. 29).  As explained below, Defendant's motion[2] will be GRANTED in part and DENIED in part.

## I.    BACKGROUND

The Children's Home of Cincinnati ("TCH") is a non-profit organization that provides mental health and behavioral health counseling to adolescents.  (Hinton depo., Doc. 22 PAGEID 451 (7:9–18), 452 (8:6–11)).  The students who attend class there have been removed from traditional schools in their district (located in one of three counties: Hamilton, Butler or Clermont).  (Id. PAGEID 454–455 (10:25–11:2)).  Each comes with

---

[1] The Children's Home of Cincinnati has since merged with Saint Aloysius Orphanage; together they are known (and do business as) Best Point Education & Behavioral Health.  (*See* Hinton depo., Doc. 22 PAGEID 450 (6:1–7), 454 (10:14–19); Banchy depo., Doc. 24 PAGEID 568 (6:7–24)).

[2] In its summary judgment papers, Defendant's citations (to case law and statutes) appear in footnotes. This is improper.  Counsel is directed to review the undersigned's Standing Order on Civil Procedures, Part I.G ("In the spirit of compliance with the rules, all briefs and memoranda shall comport with the following: . . . 3. Citations to be in main body of text and not in footnotes.") (available at https://www.ohsd.uscourts.gov/sites/ohsd/files//Trial%20Procedure_Civil_Updated_2023.pdf).

an Individual Education Plan ("IEP") that TCH follows.  (Id. PAGEID 455 (11:2–6)).  Every school day is divided between traditional education and therapeutic counseling.  (Id. PAGEID 457 (13:5–13)).  A typical classroom is limited to eight students, staffed by a teacher (professional) and an aide (paraprofessional).  (Id. PAGEID 458 (14:3–15)).

Ninety percent of the students "have experienced some type of trauma, which is why they are on [TCH's] campus."  (Id. PAGEID 458 (14:1–2)).

TCH employs a safety security officer and contracts with the City of Cincinnati Police Department to assign two school resource officers to patrol their Madisonville (and Red Bank Road[3]) campuses.  (Id. PAGEID 459–460 (15:23–16:19)).  One school resource officer is always on site at the (main) Madisonville campus.  (Id. PAGEID 460–461 (16:20–17:2)).

**Harris's employment at TCH.**  Plaintiff Sandra Harris began her employment at TCH in July 2018 as a Day Treatment Intervention Specialist[4] II.  As such, Harris was responsible for teaching the traditional education portion of each school day to two separate groups of students.  (Harris depo., Doc. 21 PAGEID 322 (78:8–22) ("I had two separate classes of students, the yellow group, the green group.  My role was to teach and monitor and provide a learning experience for my – for my students.  I taught the entire curriculum to the students, all subjects.")).

Like all TCH staff, Harris was trained on restraints, crisis prevention, and de-escalation techniques so she could "meet the needs of a student who we already know coming in the door with lots of different challenges."  (Hinton depo., Doc. 22 PAGEID 459

---

[3] Students with autism attend school at the (smaller) Red Bank Road campus.  (Hinton depo., Doc. 22 PAGEID 456–57 (12:20–13:4), 460 (16:4–14)).  No events surrounding this litigation occurred there.

[4] All teachers at TCH are intervention specialists.  (Hinton depo., Doc. 22 PAGEID 456 (12:8–13)).

(15:11–16)).  Additionally, she was provided a radio ("walkie-talkie")[5] that allowed her to communicate with TCH staff, to include the safety security officer and the school resource officers.  (Id. PAGEID 460 (16:15–19)).

While employed at TCH, Harris (maintains she) was assaulted twice: first on August 30, 2018; then, a second time, on November 19, 2019.

**August 2018 incident.**  Harris noticed that one of her students was looking at "nude sites" (while in the classroom) on his Chromebook.  (Harris depo., Doc. 21 PAGEID 324–325 (80:10–81:7)).  She asked him to "close it," after which he threw the Chromebook on the floor.  (Id. PAGEID 325 (81:8–11)).  When Harris reached down to pick up the laptop, the student threw a (computer) mouse at her, hitting the left side of her face.  (Id. PAGEID 325–327 (81:12–83:13)).

Harris immediately radioed for assistance.  (Id. PAGEID 327–328 (83:20–84:4)).  Staff arrived and restrained the student.  (Id. PAGEID 328–329 (84:8–85:14)).  Harris was in pain and her face was swelling.  (Id. PAGEID 330 (86:15–87:13)).  She later sought medical attention at Concentra Urgent Care, where, Harris testified, she was diagnosed with a concussion.  (Id. PAGEID 331–32 (87:14–88:2), 333 (89:7–12)).[6]

Despite being told "we don't file charges against students," Harris reported the incident to the police.  (See id. PAGEID 337–338 (93:25–94:2); PAGEID 339–341 (95:2–97:1)).  She asked for a copy of the (security) video of the incident; the school resource officer refused her request.  (Harris decl., Doc. 27-1 ¶ 3).  A juvenile court prosecutor

---

[5] (See Harris depo., Doc. 21 PAGEID 327–328 (83:20–84:2)).

[6] No medications were prescribed, but Harris was instructed to return (3 times per week for 2 weeks) for an hour of therapeutic exercises, therapeutic activities, and manual therapy (i.e., dry needling). (See Doc. 27-2 PAGEID 718–739).

subpoenaed the footage and a formal proceeding followed, at which Harris testified.  As she described it, the student was found "liable" for her injury.  (Harris depo., Doc. 21 PAGEID 338 (94:3–16); Harris decl., Doc. 27-1 ¶ 4).  While ongoing, according to Harris, no one at TCH "offered support or would even talk to [her] about it."  (*See* Doc. 27-1 ¶ 4).

**2019/2020 employment contract.**  TCH offered Harris a second contract— effective August 1 through July 31—as a Lead Mentor Intervention Specialist, which she accepted.  (*See* Doc. 19-2, Employment Agreement).[7]  The Agreement "automatically expire[d] at the end of the Term without any further action or notice required by either Party."  (Id. PAGEID 170 ¶ 16).  "Any subsequent employment of the Employee for the following School Year [was] conditioned upon the execution of, and subject to the terms and conditions of, a new written agreement executed by the Parties."  (Id.).  TCH reserved the right to terminate Harris: if she breached the Agreement; for cause; or "upon the closing of the assigned education program for any reason."  (Id. PAGEID 169–170 ¶ 11). Harris had the option to resign.  (Id. PAGEID 169 ¶ 13).  To this end, she agreed to give TCH a 30-day written notice.  (Id.).  Failing that, she further agreed to be "personally liable for any damages, including the cost of a replacement, incurred by the Employer as a result of the Employee's breach of this contract."  (Id.).  TCH reserved the right to "release the Employee on the date requested; or (b) release the Employee on a date prior to or subsequent to the requested date."  (Id.).

---

[7] Harris testified that, in her evaluation, she "was noted as an exceptional teacher.  I was asked to participate as a mentor for other teachers.  I was given the leadership of a leader teacher.  I was placed into their principalship programs as well to be groomed into an assistant principal."  (Harris depo., Doc. 21 PAGEID 343 (99:2–9)).  Harris was rated 4.6 (highly effective) out of 5.0 (exceptional).  (Doc. 25-8 PAGEID 668, 2019 Annual Review – Edu).

**November 2019 incident.**  Harris's second school year was off to a good start. (Harris depo., Doc. 21 PAGEID 347 (103:18–22) ("[T]he school year was going great. The school year was going fine.")).  No "problems" with her students, only "challenges." (Id. PAGEID 347–348 (103:25–104:6) ("Every day you have challenges with students, so yes.  They're not problems.  They're just challenges that one tries to overcome every single day."); *see also* id. PAGEID 349 (105:2–13) ("Every day there's a challenge.  That student is at that school for a reason, a behavioral reason.  So every day is a challenge that you try to overcome and give strategies to work with that student.")).

On Tuesday, November 19, 2019, Harris testified that one of her students "was having a challenging day that he wasn't dealing with very well."  (Id. PAGEID 353 (109:1–9)).  He began to "act out" in the classroom.  (Id. PAGEID 353 (109:10–13)).  Harris and the other students left so a different staff member, better suited to handle these types of outbursts, could take charge.  (Id. PAGEID 353–354 (109:14–110:8)).  While in the hallway, Harris insists she was struck in the (back of her) head by a backpack. (Id. PAGEID 355–356 (111:17–112:20); PAGEID 365 (121:3–10)).

Harris reported the incident to her immediate supervisor, John Horn.  (Id. PAGEID 365–366 (121:21–122:7)).  She then met with Heather Ellison—in Ellison's role as the "client rights officer"—who sent Harris to the same urgent care as before, Concentra. (Id. PAGEID 368–369 (124:2–125:5); *see* Ellison depo., Doc. 23 PAGEID 549–550 (9:4–10:8)).

Harris returned to work the next day, Wednesday (November 20).  (Harris Depo., Doc. 21 PAGEID 370–371 (126:12–127:2)).  At some point, she met with Ellison and one-or-more police officers.  (Id. PAGEID 371–373 (127:3–129:17)).  Harris asked for an

incident report and stated that she wanted to file charges against the student. (Id. PAGEID 372 (128:11–15)).  A video of the incident was played.  (Id. PAGEID 373– 374 (129:6–130:9)).  Ellison expressed her opinion that there wasn't enough evidence to proceed and the officers, based on their years of experience, agreed.  (Id. PAGEID 372– 373 (128:22–129:1), 374 (130:10–16), 375–377 (131:13–133:12);  Harris decl., Doc. 27-1 ¶ 6).

**Plaintiff's "conclusion of employment" at TCH.**  Later that day, and at his request, Harris met with Rod Hinton, TCH's Chief Administrative Officer ("CAO").  (Harris depo., Doc. 21 PAGEID 378–379 (134:25–135:24); *see* Hinton depo., Doc. 22 PAGEID 466 (22:8–13)).  She described the incident to Hinton "in detail," and advised that she "was still suffering from a headache."  (Harris decl., Doc. 27-1 ¶ 7).  And, because he was not TCH's CAO at the time, Harris recounted "in depth" the August 2018 assault and the fact that she had suffered a concussion.  (Id.).  She explained to Hinton that her "current" injury, because it was a second "acute" injury, had "exacerbated [her] existing post-concussion symptoms."  (Id.).

Hinton, she recalled, "reinforced" the notion that "teachers shouldn't – cannot file charges against students."  (Id. PAGEID 379 (135:12–21)).  Hinton, in Harris's words, "wasn't pleased with me."  (Id. PAGEID 379–380 (135:25–136:2)).  Harris denies telling Hinton (during that meeting) that she wanted to resign or wanted to meet with a financial planner to "prepare for a resignation date."  (Id. PAGEID 380 (136:5–12)).  Rather, according to Harris, Hinton himself brought up resignation, on the premise that "[TCH] can't afford to have teachers who file charges against students when an assault happens."  (Id. PAGEID 380 (136:13–21)).

Rod Hinton tells a different story.  He testified that Heather Ellison told him that Sandra Harris "wanted to get out of her contract" in the wake of the backpack incident. (Hinton depo., Doc. 22 PAGEID 465 (21:7–25)).[8]  Harris confirmed as much (during their meeting on November 20) but needed a day to talk about "when" with her financial advisor.  (Id. PAGEID 466–471 (22:11–20), (24:4–27:12) ("Q. … When you had the conversation with her, was it your understanding that she was going to be conferring with her financial advisor in order to make a decision on whether to resign?  A. It was my understanding that she was talking to her financial advisor to understand when she can resign.")) (underline emphasis added).  Hinton wanted the separation to be "as seamless as possible for the students.  It was already at the holidays.  And I gave her the option, we can do this at Thanksgiving, we can do this at Christmas, but let's do it at a time of this year where it's less interruption to the kids."  (Id. PAGEID 470 (26:2–8)) (underline emphasis added).

Hinton denied talking with Harris "about her desire to pursue criminal charges against the student."  (Id. PAGEID 471 (27:13–18)).  And he was not aware of "anyone" at TCH that "discourag[ed]" her from doing so.  (Id. PAGEID 472 (28:6–10)).

Harris worked on Thursday (November 21), but not on Friday (November 22), because, in her words, she "was sick due to the head injury, physically and mentally."

---

[8] Aside from the CEO, only Hinton had authority "to let [Harris] out of her contract."  (Hinton depo., Doc. 22 PAGEID 465 (21:14–25)).  He called for the meeting on November 20 because:

> My understanding was that she has indicated to Heather and in front of two officers her desire to get out of her contract.

> I can allow her out of her contract.  I met with her to ensure that what she is saying in front of people that wasn't in front of me.

(Id. PAGEID 468 (24:18–23)).

(Id. PAGEID 381 (137:1–3), 382 (138:16–21); *see* id. PAGEID 384 (140:11–15)).[9]  On Saturday (November 23), Harris sent an email to John Banchy, TCH's CEO, to explain:

> I didn't want to resign and I wanted – I wanted to go to work and [Rod Hinton's] persistence in letting me know that teachers cannot file charges against students, you have an option and that option is that if you can't, you know, guarantee [Hinton] that you're not going to do it again, you're going to have to resign.  I – I enjoyed my job.  I wanted to work for The Children's Home.

(Id. PAGEID 383–384 (139:18–140:10)).  The text of Harris's email read: "Th[is] letter is to <u>serve as notification</u> that I have obtained legal representation and <u>will not resign</u> on Tuesday, November 26, 2019, <u>as requested</u>. I am also <u>requesting notification</u> of <u>when I may return to work</u>." (Doc. 19-6) (underline emphasis added).  Banchy forwarded Harris's email to Hinton (and Pam McKie), with the instruction, "Rod, we should probably [h]uddle up."  (Id.; Banchy depo., Doc. 24 PAGEID 592–593 (30:23–31:5)).

On Monday (November 25), at 8:03 AM, Hinton responded to Harris's email to Banchy:

> Good morning! Mr. Banchy is in-and-out of the office this morning and has forwarded your message dated Saturday, November 23 to me – Letter of Intent.
>
> We welcome you to return to work as you were never requested/directed to be away nor to resign. On the contrary, at your invitation I granted your verbal request to dissolve your employment agreement and furthermore granted your wish to take time to consider retirement and speak to a financial representative. You then called in sick on Friday, November 22. <u>At no time did I ask you to resign or indicate that you were not welcome to continue your work</u>.

---

[9] An email sent by John Horn at 7:51 AM to Roderick Hinton, April Kandil (Director of Campus Based Programs), Pam McKie, and the Executive Leadership Team advised, "Just wanted you to be aware that Sandy called off sick today."  (Doc. 29-2 PAGEID 685).

> Per your email to Mr. Banchy, <u>it appears you have had a change of heart and would like to continue your employment. As such, you are welcome and expected to return</u>.

(Doc. 19-7) (underline emphasis added). Harris responded at 8:20 AM, telling Hinton to "[p]lease submit all communications to my legal Representatives." (Id.). Hinton emailed Harris (directly, with a copy to Human Resources Manager Dawn Kaylor) at 2:41 PM:

> <u>This email serves as a formal acceptance of your intent to resign</u>. You did not respond to my offer to return to work on Friday, November 22 and discuss the final details of your resignation as originally intended. As you know, you gave The Children's Home notice of your intent to resign on November 20, 2019. This was witnessed by Heather Ellison, Chief Strategy Officer, and three Cincinnati police officers. After your resignation announcement, you and I then met, and you confirmed your intent to resign to me. The only remaining detail was what day you planned to have as your last day of employment.
>
> I attempted to discuss the details of your resignation three times – our appointment Thursday morning with no conclusive date, an appointment scheduled for Friday morning, and now via email today. <u>You have declined to communicate with me</u>. <u>Instead, on Saturday, you sent the President & CEO an email stating that you will not resign "as requested."</u> This is a blatant misrepresentation of our conversation, as you told at least four people your desire to quit your job and dissolve your contract.
>
> At this point, we need to move forward. <u>The Children's Home deems November 27, 2019, as the date upon which your resignation takes effect</u>. Per the terms of your contract, you are released from employment due to voluntary resignation, and all benefits and privileges of employment end as of Wednesday.

(Doc. 19-8) (underline emphasis added). Approximately two hours later, at 4:37 PM, a letter from Dena Mason-Zied, DO (on Kettering Physician Network Primary Care stationery) was faxed (by "Harris Family") to TCH. It reads:

> Sandra Y. Harris DOB [ ], sustained a <u>closed head injury</u> while at work on Tuesday, November 19, 2019. Although she did not lose consciousness, she did develop signs and symptoms of concussion syndrome. Due to the fact that Ms. Harris experienced a previous

closed head injury on August 30, 2018 causing a concussion, this second head insult will require a longer period of time for recovery.

Ms. Harris underwent a Head CT and will receive the results later today. Given her current symptoms and nature of her injury it is recommended that she adhere to complete brain rest for at least two weeks starting today.

(Doc. 19-9) (underline emphasis added).[10]

**This lawsuit.** Harris a five-count Complaint alleging violations of the federal Americans with Disabilities Act ("ADA") (and its Ohio counterpart) (discrimination, retaliation, and failure to accommodate)[11] (Counts 1, 2 & 3) and the federal Family and Medical Leave Act ("FMLA") (interference) (Count 4). She also alleges that her termination—for reporting acts of assault on school property—violates Ohio public policy (Count 5).

TCH moves for summary judgment on all counts, which the undersigned will address in reverse order. Harris asks the Court to deny the motion altogether because the "vast majority" of it is based on "one hotly disputed fact—that [she] resigned." (Doc. 28 PAGEID 1056). She is correct, at least with respect to her retaliation, FMLA (interference), and public policy claims.

## II.     LAW & ANALYSIS

**Summary judgment standard.** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the

---

[10] "[F]rom my perspective, just being honest, I almost felt like [this letter] was fraud." (Banchy depo., Doc. 24 PAGEID 614–615 (52:19–53:10)).

[11] As a predicate, Harris filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and was issued a Notice of Right to Sue. (*See* Doc. 1-2).

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248–49. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).[12]

**Sham affidavit.** The sham-affidavit rule forbids a party from "creat[ing] a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).[13] We bear in mind, however, the Sixth Circuit has taken up a "relatively narrow definition of a contradiction." *Id.* (quoting *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006)).

---

[12] Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

[13] This practice "is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006). If this were not the case, it "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reich*, 945 F.3d at 976 (quoting *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)).

"[D]eponents have no obligation to volunteer information that the questioner fails to seek." *Id.* (citing *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) & *Briggs*). "If a party 'was not directly questioned about an issue,' a later affidavit on that issue simply 'fills a gap left open by the moving party.'" *Id.* (quoting *Aerel*). And when a declaration merely "fills a gap left open by the moving party and thus provides the district court with more information, rather than less," the Sixth Circuit allows its consideration at the summary judgment stage. *Cartwright v. d.e. Foxx & Associates, Inc.*, No. 24-3032, 2024 WL 3429296, at *2 (6th Cir. July 16, 2024) (quoting *Aerel*).

TCH complains that the hearsay statements within Harris's declaration, purportedly made by its managers, are "entirely self-serving". One would expect as much. But that only matters if TCH can concomitantly single out specific *contradictions* between the testimony Harris gave during her deposition and the statements she subsequently made in her declaration. Because it doesn't, the sham-affidavit rule has no bearing here. Thus, as appropriate, the Court will consider Harris's testimony given in her declaration as well as in her deposition.

**Ohio public policy claim.**[14]

"To establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must show (1) 'a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the **clarity** element)'; (2) dismissal 'under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the **jeopardy** element)'; (3) 'the plaintiff's dismissal was motivated by conduct related to the public policy (the **causation** element)'; and (4) lack of an 'overriding legitimate business justification for the dismissal (the **overriding justification** element).'"  *Hale v. Mercy Health Partners*, 617 F. App'x 395, 402 (6th Cir. 2015) (citing *Collins v. Rizkana*, (1995) 73 Ohio St. 3d 65, 69–70, 652 N.E.2d 653, 657–58) (all emphasis added).   "The first and second elements are questions of law for the court to decide, but the jury decides questions of fact relating to the latter two elements."  *Id.* (citing *Collins*, 73 Ohio St. 3d at 70, 652 N.E.2d at 658).[15]

---

[14] Employment in Ohio is generally governed by the common law doctrine of employment-at-will. *See Wiles v. Medina Auto Parts*, (2002) 96 Ohio St. 3d 240, 773 N.E.2d 526, ¶ 5; *Collins v. Rizkana*, (1995) 73 Ohio St. 3d 65, 67, 652 N.E.2d 653, 656.  "The Ohio Supreme Court, however, recognized an exception to this doctrine when an employee has been wrongfully discharged in violation of public policy as set forth in the statutory enactments," and such a claim "is commonly referred to as a '*Greeley* claim.'" *Tracy v. Northrop Grumman Sys. Corp.*, No. 1:08cv126, 2009 WL 690255, at *2 (S.D. Ohio Mar. 12, 2009), *aff'd*, No. 10-3930, 2011 WL 6965839 (6th Cir. Dec. 21, 2011) (citing *Greeley v. Miami Valley Maint. Contractors, Inc.*, (1990) 49 Ohio St. 3d 228, 551 N.E.2d 981).  "The Ohio Supreme Court later expanded the scope of such *Greeley* claims to encompass employees who have been wrongfully discharged in violation of public policy, not only as set forth in [statutes] but also in violation of the Ohio and United States Constitutions, administrative rules and regulations, and common law." *Id.* at *2 (citing *Painter v. Graley*, (1994) 70 Ohio St. 3d 377, 639 N.E.2d 51).

[15] Starting with the first element, the clarity element, a plaintiff must identify some source of "clear public policy" to support her claim.  *Romero v. City of Middletown*, 479 F. Supp. 3d 660, 671 (S.D. Ohio 2020). This requires a plaintiff to do two things: (1) "*specifically* identify the sources, and also identify specific policies located within those specific sources, rather than make general assertions to broad policies" (the specificity requirement); and (2) establish that "the sources of the public policies [ ] parallel Ohio's whistleblower statute (i.e., a parallelism requirement)."  *Romero*, 479 F. Supp. 3d at 671 (italics emphasis in original) (citing both *Hale*, 20 F. Supp. 3d at 639 & *Hale*, 617 F. App'x at 403).  Under Ohio law, it is the plaintiff's burden to identify the public policy and the sources for that policy.  *Romero*, 479 F. Supp. 3d at 674 (citing *Dohme v. Eurand Am., Inc.*, (2011) 130 Ohio St. 3d 168, 173, 956 N.E.2d 825, ¶ 22).  A court may not do so *sua sponte*.  *Id.*

TCH takes no issue with the statutes on which Plaintiff relies, Ohio Rev. Code § 2903.13(C)(4)(d), which makes it a fifth-degree felony to assault a teacher on school property, and Ohio Rev. Code § 2921.22(A)(1), which imposes criminal liability on any person who fails to report a crime to law enforcement. (*See* Doc. 19 PAGEID 137). The Court proceeds, then, as if the clarity and jeopardy elements have been established as a matter of law.

TCH submits that no evidence supports the third element, causation, because Harris (1) suffered no adverse employment action after reporting the August 2018 incident; and (2) resigned after the November 2019 incident. (*See* id. & Doc. 29 PAGEID 1093).[16] The Court disagrees.

True, Harris was rehired (and evidently promoted) for the 2019–2020 school year, which obviously post-dates the August 2018 assault. But the fact that she pressed charges then was an articulated concern by TCH management in the aftermath of the November 2019 incident. (*See, e.g.*, 11/19/2019 (2:09 PM) email from John Horn to Heather Ellison, Doc. 25-12 PAGEID 693 ("Did she indicate that she wants to file charges against the student?"); 11/20/2019 (12:43 PM) email from Heather Ellison to Roderick Hinton, Doc. 25-11 PAGEID 691 ("We learned today that she filed a complaint with the student services division of Cincinnati Police Dept . . . An officer came out to investigate, reviewed the video, and didn't see anything that would warrant an assault charge. However, she was given the opportunity to file an assault charge or file an incident with

---

[16] Defense counsel writes that TCH also reported the November 19 incident to police. But, as Plaintiff's counsel points out, no record evidence supports this account.

the CPD. . . . <u>She chose to file an Incident</u>, which is documentation that an incident occurred.")) (underline emphasis added).

Above all, though, is a threshold dispute. Did Harris express an interest in being released from her 2019/2020 employment contract so that she could "resign"? Or—consistent with its professed "clear policy of ***not*** filing charges against students for disruptive or disobedient behavior"[17]—did TCH engineer a "resignation" to avoid terminating her "outright"? (*See* 11/21/2019 (9:11 AM) email from Roderick Hinton to Executive Leadership Team, John Horn, April Kandil, Doc. 25-9 PAGEID 686 ("It is my intention to allow her request for cancellation to dictate this process. With that said, <u>she is under contract and has not put into writing a desire to withdraw</u>. So we need to allow her [to] move the process in a mutually agreeable way. <u>The alternative is an outright termination</u>. <u>So we need to be patient and allow me to massage the situation</u>.")) (underline emphasis added). Denials by Banchy[18], Hinton[19], and Ellison[20] that any such policy exists only add to the mix of material facts the jury must sort out.

Summary judgment, accordingly, will be denied as to this count.[21]

**FMLA (interference) claim.** "The FMLA entitles qualifying employees up to 12 work weeks of leave under specified circumstances, including if they are suffering from a serious health condition." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th

---

[17] (*See* EEOC Position Statement, Doc. 25-3 PAGEID 651) (all emphasis added).

[18] (Doc. 24 PAGEID 574 (12:16–20)).

[19] (Doc. 22 PAGEID 461 (17:7–15), 480 (36:3–12)).

[20] (Doc. 23 PAGEID 555 (15:19–21), 557 (17:9–16)).

[21] In its reply, TCH alludes to—but fails to develop any meaningful argument regarding—the fourth element, overriding justification. (*See* Doc. 29 PAGEID 1093).

Cir. 2016) (citing 29 U.S.C. § 2612(a)(1)(D)). The Sixth Circuit "has recognized two theories of recovery under the FMLA: interference and retaliation." *Id.* (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012)).[22] As noted, Harris alleges interference.

"To establish a claim for interference under the FMLA, a plaintiff must demonstrate that (1) she is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *Tennial*, 840 F.3d at 308 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481 485 (6th Cir. 2005)).[23]

TCH maintains that Harris falls short as to both the third and fourth elements, because she was no longer an employee at the time she requested leave. Rod Hinton formally "accepted" her resignation on November 25 at 2:41 PM, nearly two hours before Harris's request for leave—in the form of her doctor's advice that she needed "complete brain rest" for "at least two weeks starting today"—was tendered. But, again, whether Harris resigned (as TCH claims), or whether TCH concocted a false narrative (as Harris claims) is very much in dispute. Moreover, Hinton specified that Harris's "resignation" would be effective Wednesday (November 27), two days later; until then, she enjoyed "all benefits and privileges of employment[.]" (*See* Doc. 19-8).

---

[22] "Although a plaintiff can proceed under both theories, the proof needed for each claim differs." *Tennial*, 840 F.2d at 307–08 (citing *Seeger*). "A plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent, whereas **a plaintiff alleging interference need not prove any unlawful intent on the part of his employer**." *Id.* at 308 (citing *Seeger*) (all emphasis added).

[23] The "interference" theory is also referred to as the "entitlement" theory. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

TCH insists that "[t]he record is replete with contemporaneous evidence memorializing [Harris's] request to resign." (Doc. 29 PAGEID 1084). But the "record" to which TCH refers are emails authored—and testimony given—by managers with (arguably) a vested interest in Harris resigning. In contrast, the only email written by Harris that's part of the record states clearly that she won't resign "as requested." (*See* Doc. 19-6). Under these circumstances, whether this material fact is disputed simply cannot be decided by tally.

Summary judgment will be denied as to this count as well.

### ADA (discrimination, retaliation, and failure to accommodate) claims.

**Discrimination.** The ADA, as amended by the Amendments Act of 2008, makes it unlawful for an employer to "discriminate against a qualified individual ***on the basis of disability in regard to*** job application procedures, the hiring, advancement, or ***discharge*** of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (all emphasis added). Ohio Rev. Code § 4112.02(A) prohibits discrimination generally, including "discharge without just cause," against an employee because of his "disability."[24]

A plaintiff can prove a claim for discrimination based on wrongful termination under the ADA through direct or circumstantial evidence. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 79 (6th Cir. 2020). When analyzing an ADA discrimination claim based on circumstantial evidence, courts in the Sixth Circuit use an adapted version of *McDonnell*

---

[24] "Ohio courts follow federal law in regard to disability discrimination claims filed under O.R.C. § 4112.02." *Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 578 n.5 (6th Cir. Aug. 20, 2019) (citing *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 776 (N.D. Ohio 2013)). Thus, Harris's federal and state claims rise or fall together. *Moore v. Next Generation Hospitality LLC*, No. 24-4050, 2025 WL 3025607, at *3 (6th Cir. Oct. 29, 2025) (citing *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848 n.1 (6th Cir. 2018)).

*Douglas* burden-shifting framework. *Id.* at 79–80. Specifically, in such a circumstance, a plaintiff must show that (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision[25]; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *Plank v. Great Am. Fin. Res., Inc.*, No. 1:19-cv-935, 2021 WL 3089374, at *8 (S.D. Ohio July 22, 2021). Of note, "***[p]roof of a disability is a threshold requirement*** to prove a violation of the ADA." *Moore*, 2025 WL 3025607, at *5 (quoting *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 164 (6th Cir. 2005)) (all emphasis added).[26]

"A plaintiff's burden 'in establishing a prima facie case is not onerous and is easily met.'" *Burgess v. Indus. Fabricators, Inc.*, No. 2:19-cv-4579, 2021 WL 1140096, at *5 (S.D. Ohio Mar. 25, 2021) (quoting *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019)). Still, drawing all reasonable inferences in her favor, Harris comes to grief. As an initial—and conclusive—matter, she does not present "significant probative evidence" of a disability.

A "disability" is defined as a physical (or mental) impairment that substantially limits one or more of an individual's major life activities. 42 U.S.C. § 12102(1)(A). "[M]ajor life

---

[25] As to the third element, the disability must be a "but-for" cause of the adverse employment decision. *Tennial v. United Parcel Serv.*, 840 F.3d 292, 306–07 (6th Cir. 2016). That is to say, "the plaintiff must present ***sufficiently 'significant' evidence of animus toward the disabled*** that is a but-for cause of the discriminatory behavior." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (all emphasis added); *Gamble v. Greater Cleveland Reg. Transit Auth.*, No. 15-4208, 2017 WL 5135537, at *2 (6th Cir. June 2, 2017) (citing *Gohl*).

[26] If the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Brown*, 814 F. App'x at 80. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason is merely pretext. *Id.* (citing *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019)).

activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *Id.* § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

"'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). "[T]o determine whether a bodily function is limited to the degree requiring protection under the ADA (i.e., 'substantially' limited), courts generally ask how well the plaintiff's major bodily function operates 'as compared to the general population.'" *McGonegle v. Select Comfort Retail Corp.*, No. 1:19-cv-442, 2021 WL 229038, at *6 (S.D. Ohio Jan. 22, 2021) (Cole, J.) (citing *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) (quoting 29 C.F.R. § 1630.2(j)(1)(ii))). "Although a 'substantial limitation need not be severe,' merely alleging 'difficulties' related to the operation of a major bodily function does not show actual disability." *Id.* (quoting *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 876 (4th Cir. 2020)).

Harris testified that she is suffering from head injuries sustained in August 2018 and November 2019. (Harris depo., Doc. 21 PAGEID 283–285 (39:21–41:11)). Her symptoms include headaches, memory loss, dizziness, problems sleeping, and emotional/psychological "difficulty." (Id.). But when asked to elaborate, she couldn't.

> Q. You told me that there's pain you currently experience as a result
> of the two head injuries you allege.
> A. Yes.
> Q. Can you describe the pain that you currently have?

A. <u>No.</u>

Q. Well, as we sit here right now are you experiencing pain that you would connect to those alleged head injuries?

A. <u>No.</u>

Q. When was the last time you experienced pain as a result of those alleged head injuries?

A. <u>I don't recall.</u>

Q. Would you say that the pain that you experience as a result of those alleged head injuries happens monthly, weekly or more or less than those time periods?

A. <u>I don't know.</u>

Q. Well, how do you know that you have pain as a result of those head injuries if you don't know when you have it?

A. Because I feel pain, but <u>I don't mark it on my calendar when I feel pain.</u>

Q. What is the sensation that you feel that you describe as pain when you feel it?

A. <u>Head discomfort.</u>

Q. Anything else?

A. <u>I don't recall.</u>

…..

Q. Did you ever experience dizziness before the head injury in August of 2018?

A. No.

Q. How frequently do you suffer from dizziness as a result of the head injuries that you're alleging?

A. <u>I don't know the frequency.</u>

Q. Have you suffered from dizziness in the past month?

A. <u>You know, I don't know the frequency.  I just don't know the frequency.</u>

Q. When you have pain that you attribute to the head injuries, what is the pain level like on a scale of one to ten?  One being the least amount of pain, ten being the most.

A. <u>It varies.</u>

Q. At its worse, what number would it be?

A. <u>I don't know.  When I'm in pain I don't measure the strength.  And I'm not trying – I just don't know the measurement of it.</u>

…..

Q. You told me that you're having severe sleeping problems as a result of the head injuries?

A. Yes.

Q. Do you want to – it's okay.  I don't want to stop you from answering.

A. Yes, when the head pain is so severe, it limits the amount of sleep that one – that one can obtain.

Q. Have you ever suffered from challenges sleeping before your

work at The Children's Home?
A. Before my head injury, no.
Q. You told me that you're – I'm sorry, you are experiencing emotional difficulties as a result of the head injuries; is that right?
A. Yes.
Q. Can you explain what are those emotional difficulties you're experiencing?
A. Memory lost, recalling.
Q. Have you at any time treated with a medical professional for the sleeping issues that you're having?
A. I have not.
Q. Have you at any time treated with a medical professional for the emotional difficulties that you're experiencing?
A. I have not.
Q. Have you ever treated with a psychologist?
A. No.

(Id. PAGEID 291–295 (47:5–48:8), (48:18–49:12), (50:23–51:25)) (underline emphasis added).  Harris was equally vague when asked to describe how her injuries limited her activities:

Q. Do you currently have any limitations on activities that you can do as a result of the symptoms that you allege from the head injuries?
A. Yes, yes.
Q. What are those limitations?
A. It depends on the activity as to if that activity has limitations or not.
Q. Are there certain things that you can't do that you were able to do prior to August of 2018?
A. Yes.  Sitting here with the lights I need my glasses on constantly in order to concentrate, for example, to focus, and I'm sure there's others I don't recall right now.
Q. So as we sit here today, the only limitation on activity you can describe to us is the need to wear glasses when you're in a room with light?
A. No, recalling information.
Q. Okay.  Any other limitations?
A. The fear that I have, I never had it before.  The uncomfortableness, I've never had that before.
Q. The fear of what?
A. Recalling this incident.
Q. When you say this incident, what are you describing?
A. The 2018 incident and the 2019 incident.
Q. So in asking about limitations on things that you can do, it sounds like you've now had a shift where you need to wear glasses in

21

conditions with light; is that right?

A. I used the term the amount of time sitting here.

Q. So at some point in sitting in a room with light, you feel the need to have glasses on?

A. In this particular atmosphere with the density of the lights and the ambiance, yes.

Q. Did you ever wear glasses before August of 2018?

A. Yes, I did.

Q. Were they prescription glasses that you had before August of 2018?

A. They were.  They were, yes.

Q. Are the glasses that you've got on as we sit here, are those prescription glasses?

A. Yes, they are.

Q. What is the prescription for?

A. Reading.

Q. Before August of 2018, was it a reading prescription that you had for your glasses?

A. Yes.

Q. Was there any change in the prescription from –

A. Yes.

                    MR. BUTLER: Let her finish the question.
                    THE WITNESS: I'm sorry.  I'm so sorry.
                    MS. ALLOUCH: No, you're doing great.
                    THE WITNESS: I apologize.

BY MS. ALLOUCH:

Q. Is there any change in the prescription for your glasses before August of 2018 to now?

A. Yes, ma'am, there are.

Q. What is the change?

A. I don't remember.  I don't recall the change in the prescription.

Q. So it's remained only for reading?

A. Yes.

Q. But the –

A. Yes, yes.

Q. But the – the number associated with the strength of the lens is different?

A. Yes.

Q. And is that change something that you are attributing to the August '18, November '19 incidents or is that just a change over time that would naturally occur?

                    MR. BUTLER: I'm just going to object to the form
                    of  the  question.    She's  not  a  medical

professional.  You can answer to the extent you know.
THE WITNESS: That's what I was going to say. <u>I have no idea what it's contributed to.</u>

BY MS. ALLOUCH:
Q. And so recalling information is a limitation on activity that you attribute to the two alleged incidents?
A. Yes.
Q. And then you explained that you have fear as you recall those two incidents; is that right?
A. Yes.
Q. Any other limitations on activities or things that you can['t] do that you attribute to the August of '18, November '19 incidents?
A. <u>I don't recall.  I don't remember.</u>

(Id. PAGEID 300–304 (56:8–60:4)) (underline emphasis added).

At best—and fully crediting her testimony for purposes of this motion—Harris has established "difficulties" attributable to her head injuries.[27]  As noted, though, "difficulties" are not the equivalent of "disability."[28]    *McGonegle*, 2021 WL 229038, at *6.  Furthermore, "it is clear that 'not every impairment, illness or injury will constitute a disability,' especially when the plaintiff provides 'no medical proof that [the] alleged medical condition[ ] substantially limited a major life activity.'"    *Id.* (quoting *Perry v. Am. Red Cross Blood Servs.*, No. 3-13-1146, 2015 WL 1401058, at *2 (M.D. Tenn. Mar. 26, 2015), *aff'd on other grounds*, 651 F. App'x 317 (6th Cir. 2016)).  That's exactly the case here.  There is no record evidence that Harris requested leave or accommodation after the August 2018 assault.  Nor did she testify that the concussion she suffered then

---

[27] The Court discounts Harris's need for updated eyeglasses.  *See* 28 C.F.R. § 1630.2(j)(vi) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures.  However, ***the ameliorative effects of ordinary eyeglasses*** or contact lenses ***shall*** ***be considered in determining whether an impairment substantially limits a major life activity.***") (all emphasis added).

[28] Harris herself unwittingly acknowledges this distinction.  Although post-August 2018 "the symptoms never went away[, . . . <u>y]ou learn to work through</u>."  (Harris depo., Doc. 21 PAGEID 351 (107:17–24)) (underline emphasis added).

substantially limited a major life activity.  To the contrary, Harris performed so well that she was offered another one-year contract and a promotion.  Moreover, after the November 19 incident, the only medical proof tendered to TCH was Dr. Mason-Zied's summary note that referred to Harris developing "signs and symptoms of concussion syndrome" such that she needed "complete brain rest <u>for</u> at least <u>2 weeks</u>[.]"  (*See* Doc. 19-9 PAGEID 242) (underline emphasis added).  A physician's recommendation for a brief and finite absence from work—which Harris understood to be a request for leave under the FMLA—is not enough evidence for a jury to find that Harris was disabled.

Plaintiff's counsel cites *Atwell v. Indianpolis-Marion Cnty. Forensic Servs. Agency*, 168 F. Supp. 3d 1125 (S.D. Ind. 2016), for the proposition that post-concussive syndrome can be a disability.  True enough.  But there, unlike here, the plaintiff not only presented a diagnosis, but she had also "put forth the opinion of her treating neurologist, Dr. Puzio, who stated that Ms. Atwell's mental impairment substantially limited her major life activities of short-term memory, speaking, concentrating, and thinking."  *Id.* at 1136.  In other words, a diagnosis alone will not suffice.  "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv); *see Correa v. Otto Eng'g Inc.*, No. 21-cv-01367, 2023 WL 2664421, at *6 (N.D. Ill. Mar. 28, 2023).  That assessment as to Harris reverts exclusively to her doctor's diagnosis, period, which merely recommended short-term, non-invasive treatment.  In Harris's words, "I needed brain rest for a short period of time.  Initially it was only two weeks and I would have been able to – to function and do my job."  (Harris depo., Doc. 21 PAGEID 395 (151:1–4)).  Since June 1, 2022, Harris has been employed full-time by Cincinnati Job Corps as a (year-round) math teacher.  (Id. PAGEID 306–309

(62:12–65:3)).  Nothing "physical" or "emotional" prevents her from performing her duties there.  (Id. PAGEID 395 (151:5–12)).

Based on the foregoing, the Court determines that TCH is entitled to judgment as a matter of law as to Count 1 of the Complaint.

**Retaliation.**  "The ADA prohibits retaliation against someone who has 'opposed any act or practice made unlawful by [the ADA]' or who has 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' [in connection with] the ADA."  *Moody v. MidMichigan Med. Ctr. Midland*, 704 F. Supp. 3d 772, 780 (E.D. Mich. 2023) (quoting 42 U.S.C. §12203(a)).  "Unlike the participation clause, '[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.'"  *Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (Title VII claim)).

Harris alleges retaliation (for requesting a leave of absence as a reasonable accommodation) in violation of the opposition clause.  (Doc. 1 ¶¶ 38–43).  To establish a prima facie case of retaliation under the ADA, a plaintiff must show:

> (1) they engaged in activity protected under the ADA; (2) the defendant knew of that activity; (3) the defendant took an adverse action against that employee; and (4) there was a causal connection between the protected activity and the adverse action.

*Moody,* 704 F. Supp. 3d at 780 (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)).  "[R]equests for accommodation are protected acts."  *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015).  The pertinent inquiry in a retaliation claim is not whether a plaintiff can prove she is disabled or that her employer knows it.  Instead, what

matters is whether she can show a "good-faith request" for a reasonable accommodation. *Id.* at 423.

TCH marshals no argument as to the first, second or fourth elements. Rather, it fixes on the third, maintaining that an employee who resigns voluntarily cannot claim that she has suffered an adverse employment action. (See Doc. 19 PAGEID 131–132, Doc. 29 PAGEID 1091). But, as previously discussed, whether Harris voluntarily resigned is a disputed issue of material fact. Summary judgment, therefore, will be denied as to this count.

**Failure to accommodate.** "[F]ailing to make a reasonable accommodation falls within the ADA's definition of 'discrimination.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing 42 U.S.C. §12112(b)(5)(A)).[29] Even so, a plaintiff still must meet the "threshold burden" of showing that she is a "disabled" individual within the meaning of the ADA. *Perry v. Am. Red Cross Blood Servs.*, No. 3-13-1146, 2015 WL 1401058, at *2 (M.D. Tenn. Mar. 26, 2015), *aff'd on other grounds*, 651 F. App'x 317 (6th Cir. 2016). If a plaintiff has no disability, an employer cannot be liable "**for** discrimination because of it or *failure to accommodate it*." *Id.* (all emphasis added). Because Harris has failed to establish that she suffers from a disability as defined by the ADA, she cannot proceed on a failure to accommodate claim. *See Moore*, 2025 WL 3025607, at *8.

---

[29] "In failure to accommodate cases, the plaintiff bears the initial burden of making out a prima facie case." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022). To establish a prima facie case for failure to accommodate, an employee must show that (1) he was disabled within the meaning of the ADA; (2) he was otherwise qualified for his position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the defendant failed to provide the necessary accommodation. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020). "If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer." *King*, 30 F.4th at 560.

Accordingly, TCH is also entitled to judgment as a matter of law as to Count 3 of the Complaint.

## III.    CONCLUSION

Consistent with the foregoing, Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED** in part and **DENIED** in part.  Judgment as a matter of law is awarded to Defendant with respect to Plaintiff's federal and state disability claims for discrimination (Count 1) and failure to accommodate (Count 3).  This case will proceed to trial, however, on Plaintiff's retaliation (Count 2), FMLA (interference) (Count 4), and Ohio public policy (Count 5) claims.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court